RECEIVED
SDNY PRO SE OFFICE
2026 SEP 15 PM 4:07

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD B. HUBBUCH,<br>*Plaintiff,*<br><br>*v.*<br><br>SPERLONGA DATA & ANALYTICS SYSTEMS LLC and MATT MARTIN, individually,<br>*Defendants.* | Case No.: 26 CV 8063<br><br>**VERIFIED COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT AND N.Y. GEN. BUS. LAW § 349**<br><br>**[ TRIAL BY JURY DEMANDED ]** |

Plaintiff Edward B. Hubbuch, proceeding *pro se*, respectfully brings this Verified Complaint against SPERLONGA DATA & ANALYTICS SYSTEMS LLC ("SPERLONGA") and its founder and chairman, MATT MARTIN, for willful and negligent violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681e(b), § 1681i, § 1681n, and § 1681o, and for deceptive acts and practices under New York General Business Law § 349, against both Defendants jointly and severally, and against MARTIN individually under the doctrine of personal participation.

## NATURE OF THE CASE

1. This action arises from the unlawful transmission of false commercial debt data onto Plaintiff's personal consumer credit files by Defendant SPERLONGA, a specialized data aggregator, under the direct personal management and authorization of its founder and chairman, Defendant MATT MARTIN.

2. SPERLONGA contractually claims exclusive corporate ownership over harvested tenant payment data, thereby operating as a consumer reporting agency ("CRA") with non-delegable statutory obligations under the FCRA to ensure maximum data accuracy and execute mandatory dispute reinvestigations. Despite these duties, SPERLONGA deployed unvetted, automated database sweep engines that systematically extracted Plaintiff's commercial storefront lease and published it on the public consumer credit wires as a delinquent personal loan.

3. SPERLONGA mechanically misapplied consumer financial reporting templates to Plaintiff's commercial account. Specifically, SPERLONGA weaponized Plaintiff's monthly commercial rent payment as a fabricated consumer "credit limit," creating artificial, mathematically impossible debt-utilization metrics as high as 403% on his personal consumer credit profile.

4. Defendants maintained, re-verified, and perpetuated this false data with actual knowledge of its inaccuracy. After receiving written notice of a related federal lawsuit and a formal consumer dispute notice, MARTIN personally intervened to suppress statutorily mandated consumer reinvestigations. MARTIN caused SPERLONGA's compliance staff to cease all communications and refrain from responding to Plaintiff's dispute while authorizing internal database modifications that quarantined the records from further internal scrutiny—willfully bypassing the statutorily mandated deletion protocol.

5. By preserving the false historical data internally while deliberately omitting to transmit the mandatory command to delete the tradeline from the consumer reporting agencies,

MARTIN and SPERLONGA mechanically ensured that the destructive historical credit data remained frozen and active on the public wire at Equifax and TransUnion.

6. Defendants' intentional suppression of the dispute was calculated to conceal systemic data corruption and avoid triggering independent compliance audits they are subject to under an active, unrelated federal injunction.

7. As a direct result of Defendants' willful and negligent conduct, Plaintiff suffered catastrophic economic harm. The false reporting triggered an automated algorithmic cascade that decimated Plaintiff's credit score, forced the closure of his long-standing prime credit relationships, completely locked him out of conventional financing, and decimated his access to conventional capital.

8. Plaintiff brings this action to recover actual, consequential, statutory, and punitive damages under the FCRA and New York General Business Law § 349.

## II. JURISDICTION AND VENUE

### Subject-Matter Jurisdiction

9. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p because Plaintiff's claims arise under the FCRA. The Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

### Personal Jurisdiction

10. This Court has personal jurisdiction over Defendants SPERLONGA and MATT MARTIN pursuant to CPLR §§ 301 and 302. Defendants purposefully transacted

business within the State of New York by contracting with New York clients and transmitting data targeting a New York resident, causing tortious financial injury within this District.

**Venue**

11. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and financial harm giving rise to Plaintiff's claims occurred within the Southern District of New York. Specifically, Defendants transmitted false credit data to national consumer reporting agencies and credit grantors operating within this District, which directly caused the destruction of Plaintiff's business operations and financial credit relationships in Manhattan.

## III. RELATED-CASE ASSIGNMENT

12. This action is directly related to *Hubbuch v. Kohn, et al.*, S.D.N.Y. Case No. 25-CV-4924-JMF-SLC, currently pending before the Hon. Jesse M. Furman in this District. Both actions arise from the identical fraudulent tradeline transmitted by Defendant SPERLONGA through its proprietary reporting pipeline at the direction of the Landlord-Furnishers. The SPERLONGA discovery production obtained by subpoena in *Hubbuch v. Kohn* forms a substantial evidentiary foundation for the claims asserted herein. Assignment of this action to Judge Furman as a related case would serve the interests of judicial economy and eliminate the risk of inconsistent rulings on identical factual questions.

## IV. PARTIES

13. Plaintiff Edward B. Hubbuch is an individual natural person and a consumer as defined by 15 U.S.C. § 1681a(c), residing in Brooklyn, New York. At all times relevant to this complaint, Plaintiff operated "Memphis Seoul," a restaurant business, as a sole proprietor doing business under the name "***Bart Hubbuch d/b/a Memphis Seoul.***"

14. Defendant SPERLONGA DATA & ANALYTICS SYSTEMS LLC is a Delaware limited liability company with its principal place of business in Canoga Park, California. At all relevant times, SPERLONGA acted as a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f) and as a furnisher of credit data.

15. Defendant MATT MARTIN is an individual who, upon information and belief, is a resident of the State of Utah. At all relevant times, MARTIN was the founder, chairman, and controlling principal of SPERLONGA, exercising continuous executive authority over its operations. MARTIN is sued in his individual capacity based on his direct, personal participation in the statutory violations alleged herein.

## V. FACTUAL ALLEGATIONS

### A. Defendant's Sophistication and Personal Direction of the Reporting Program

16. Defendant MATT MARTIN founded SPERLONGA in 2011 and has continuously served as its Chairman and Chief Executive Officer.

17. Through his multi-decade executive leadership in the consumer data, banking, and real estate finance industries, MARTIN possesses actual knowledge of the federal regulatory environment governing consumer credit reporting and FCRA compliance.

18. On December 23, 2021, MARTIN personally executed a standard corporate Service Agreement on behalf of SPERLONGA with Plaintiff's commercial landlord, establishing a direct automated credit-reporting pipeline across the landlord's real estate portfolio. A true and correct copy of this Service Agreement is attached hereto as ***Exhibit A***.

19. Section 2.02 of the Service Agreement contractually mandates that all tenant and database records extracted by SPERLONGA become the *"exclusive property"* of SPERLONGA.

20. By contractually claiming absolute corporate ownership over consumer financial files, MARTIN and SPERLONGA voluntarily assumed direct, non-delegable statutory duties under the FCRA to ensure the accuracy of the reported data and to conduct mandatory reinvestigations of consumer disputes.

## B. The Initial Software Setup, Executive Visibility, and Onboarding

21. In January 2022, SPERLONGA established direct, automated database integration with the property management software used by Plaintiff's landlord.

22. SPERLONGA classified the landlord's account as a residential rental portfolio and structured its automated data pipeline to transmit payment records directly to national consumer reporting agencies, including Equifax and TransUnion.

23. Defendant MATT MARTIN was directly involved in and routinely copied on the technical onboarding directives, providing him with immediate executive visibility into the account configuration and automated data mapping pipelines from its inception.

### C. The Automated Verification Pipeline and Lack of Statutory Review

24. Beginning in February 2022, SPERLONGA processed the landlord's tenant database through a recurring monthly automated reporting protocol.

25. Under this framework, SPERLONGA sent monthly electronic payment data logs to the landlord with a strict instruction that if the landlord failed to submit manual data adjustments or notes within five (5) business days, SPERLONGA would automatically transmit the unverified data directly to the consumer credit bureaus.

26. By utilizing this passive, negative-consent operational framework, SPERLONGA systematically bypassed meaningful manual data verification, ensuring that Plaintiff's commercial storefront lease line was persistently published onto the public wire as a delinquent personal consumer loan without the oversight required by the FCRA.

### D. Defendants' Institutional Awareness and National Enterprise Footprint

27. Under Defendant MATT MARTIN's executive direction, SPERLONGA operates a national institutional data-aggregation enterprise, which includes a formal partnership with the government-sponsored enterprise Freddie Mac to process residential rental histories.

28. Through its national operations, public marketing, and vendor relationships with federal housing enterprises, SPERLONGA holds itself out as a highly sophisticated, fully compliant institutional data aggregator subject to rigorous data-integrity standards.

29. SPERLONGA's institutional sophistication and explicit awareness of federal data-integrity requirements render its deployment of structurally defective data-harvesting

algorithms—and its subsequent executive suppression of Plaintiff's consumer dispute—reckless and willful under the FCRA.

**E. Foundational Terms of the Data Transmission Agreement**

30. SPERLONGA's core business model utilizes automated interface programs to sweep third-party property management software databases and transmit the harvested financial data directly to national consumer reporting agencies, including TransUnion and Equifax.

31. Pursuant to Section 2.02 of the December 23, 2021 Service Agreement (***Ex. A***), all data extracted and processed through this pipeline becomes the *"exclusive property"* of SPERLONGA.

32. SPERLONGA deploys this data-ownership provision uniformly as a boilerplate policy across its client portfolio, thereby assuming direct, independent, and non-delegable statutory duties under the FCRA as a consumer reporting agency for thousands of individuals nationwide and within the State of New York.

33. While Section 3.01 of the Service Agreement concurrently obligated the landlord to provide accurate information and immediately report errors, SPERLONGA retained ultimate, non-delegable statutory liability under the FCRA to verify data integrity and independently reinvestigate consumer disputes.

**F. Misclassification of the Commercial Lease and Structurally False Reporting**

34. In July 2020, Plaintiff executed a commercial lease in his individual name, doing business as "Memphis Seoul," located in Brooklyn, New York. The lease was strictly a

commercial business transaction and contained no authorization for consumer credit reporting.

35. Defendant SPERLONGA obtained direct, automated electronic database access to the landlord's tenant payment portal. Without human oversight, SPERLONGA unilaterally extracted Plaintiff's commercial account data and processed it through its residential-only reporting engines.

36. By applying residential software algorithms to a commercial data stream, SPERLONGA injected multiple structurally false and impossible data fields onto Plaintiff's personal consumer credit files, including:

(a) **<u>A fabricated credit limit</u>:** Populated Plaintiff's "Credit Limit" field with a $3,600 figure representing his monthly commercial rent obligation, rather than formatting it as a "zero-filled" field pursuant to the documented industry standard;

(b) **<u>False joint liability</u>:** Misapplied "ECOA Code J" to the account, falsely communicating to automated underwriting systems that a second individual shared contractual liability for the single-obligor account; *and*

(c) **<u>A fabricated retroactive history</u>:** Retroactively populated the "Date Opened" field as July 2020 and manufactured nineteen (19) months of retroactive payment history that had never been contemporaneously reported.

37. As commercial rent arrears accumulated in the ordinary course of business, SPERLONGA's reporting system measured those business arrears against the fabricated

$3,600 limit, generating artificial, mathematically impossible revolving credit utilization ratios reaching as high as 403% on Plaintiff's personal credit wire.

38. SPERLONGA systematically deployed this unvetted, automated data-sweeping pipeline across its client portfolios as a broad corporate policy, routinely extracting and misclassifying commercial sole-proprietorship data onto the personal consumer wires.

## G. Actual Notice and Willful Perpetuation of False Reporting

39. On June 17, 2025, Defendant SPERLONGA's Consumer Disputes division received actual written notice of the dispute via copies of a federal lawsuit challenging the consumer credit reporting of Plaintiff's commercial lease.

40. Upon reviewing the dispute, SPERLONGA's internal compliance team identified immediate irregularities in the data, including a geographic address discrepancy between Plaintiff's residential profile and the commercial storefront lease.

41. SPERLONGA explicitly offered the Landlord-Furnishers an immediate operational opportunity to permanently remove the inaccurate tradeline from consumer reporting. The Landlord-Furnishers refused the deletion and directed SPERLONGA to continue the negative reporting.

42. SPERLONGA chose to perpetuate the false reporting pipeline on the public consumer credit wires despite possessing simultaneous, actual corporate knowledge that:

(a) The underlying obligation was a commercial storefront lease rather than a consumer account;

(b) SPERLONGA possessed the absolute technological capability to delete the inaccurate tradeline; *and*

(c) The Landlord-Furnishers had explicitly refused the deletion to maintain commercial collection leverage.

43. In November 2025, SPERLONGA's operations manager explicitly acknowledged in internal corporate communications that its automated software engines had misclassified the "Memphis Seoul" commercial store name as a consumer account. SPERLONGA subsequently removed similarly situated commercial accounts from its consumer credit reporting pipeline in response to separate disputes, but deliberately maintained Plaintiff's destructive tradeline on the public wire.

44. SPERLONGA possessed actual knowledge that it had previously removed secondary tenants from consumer reporting at the request of furnishers in other disputes, demonstrating actual knowledge of the removal mechanism and a deliberate choice to maintain Plaintiff's tradeline despite that knowledge.

**H. Defendants' Awareness of the Commercial Enforcement Scheme**

45. Following the filing of the related federal action (*Hubbuch v. Kohn*), the landlord actively monitored Defendant SPERLONGA's data transmission pipeline and explicitly directed SPERLONGA to continue publishing the negative metrics during active litigation.

46. SPERLONGA maintained actual knowledge that the landlord used its consumer reporting pipeline strictly as a calculated commercial enforcement mechanism.

47. SPERLONGA previously removed the negative tradeline at the Landlord-Furnisher's request when commercial rent arrears were temporarily paid, and subsequently re-initiated the destructive consumer reporting immediately upon receiving direction from the Landlord-Furnishers that new commercial arrears had accrued.

**I. Defendants' Continued Inaction Despite Lack of Legal Justification**

48. In June 2025, Defendant SPERLONGA formally escalated the dispute regarding Plaintiff's account to its outside legal counsel for review and handling.

49. Despite receiving no legal resolution or justification from its counsel to validate the reporting of a commercial storefront lease as a consumer debt, SPERLONGA deliberately chose to leave the fabricated tradeline active on the public consumer credit wires.

**J. Defendant's Personal Intervention and Suppression of the Dispute Reinvestigation**

50. On November 20, 2025, Plaintiff transmitted a formal Litigation Hold Notice via certified mail directly to Defendant MATT MARTIN by name, in his capacity as founder and chairman of SPERLONGA. A true and correct copy of this notice is attached hereto as ***Exhibit B***.

51. Upon receipt of this notice, MARTIN personally intervened in Plaintiff's active consumer dispute file. Rather than directing a statutory reinvestigation under 15 U.S.C. §1681i, MARTIN caused SPERLONGA's compliance staff to cease all communications and refrain from responding to Plaintiff's dispute.

52. Simultaneous with suppressing the dispute process, MARTIN authorized internal database modifications that quarantined SPERLONGA's records from further litigation and regulatory scrutiny while deliberately preserving the false tradeline data on the public consumer credit wires.

53. Under the FCRA, upon discovering that disputed information is inaccurate, misclassified, or unverifiable, furnishers and CRAs are statutorily mandated to actively delete the false reporting by transmitting an Automated Universal Data ("AUD") or Universal Data Form ("UDF") "Delete" command. A statutory "Delete" command completely wipes the historical tradeline from the consumer's file as if it never existed. Instead of issuing this mandatory deletion command, MARTIN caused SPERLONGA's systems to skip Plaintiff's file during future monthly automated data sweeps while leaving the previously transmitted false data intact.

54. By deploying this localized internal suppression mechanism instead of transmitting the mandatory statutory deletion command, MARTIN intentionally froze the mathematically impossible 180-plus day delinquencies, fabricated credit limits, and 403% utilization ratios on the servers of Equifax. This mechanical failure constitutes a willful FCRA violation that directly caused Plaintiff's ongoing harm, as the preserved toxic history continued to poison Plaintiff's credit profile well into 2026 without any new data transmissions being sent.

55. MARTIN's internal suppression created a bifurcated system anomaly: the data transmission logs were masked internally to shield SPERLONGA from liability, while the

false 403% debt-utilization metrics were deliberately left active on the public consumer credit wires to continue damaging Plaintiff.

56. MARTIN's personal concealment of the dispute was a calculated operational maneuver to protect his corporate interests. As part of the resolution in *Advanced Technology Group, Inc. v. Sperlonga Data & Analytics Systems LLC*, No. 3:17-CV-3270, ECF No. 258 (N.D. Tex. July 5, 2019), both MARTIN individually and SPERLONGA corporately are subject to an active, 15-year federal permanent injunction in the Northern District of Texas, running through 2034, which exposes SPERLONGA's source code and database architecture to hostile, unannounced forensic compliance audits by an independent third party. A true and correct copy of this injunction is attached hereto as ***Exhibit C***.

57. MARTIN possessed actual knowledge that public exposure of unvetted data-sweeping algorithms and operational suppression mechanisms in this action could trigger a catastrophic, enterprise-ending audit under that active federal injunction.

58. This bifurcated strategy—suppressing the investigation internally to avoid audit triggers while leaving the false reporting active on the public wire due to the deliberate failure to transmit an AUD "DELETE" command—constitutes a conscious, willful choice by MARTIN individually, and SPERLONGA corporately, in deliberate disregard of their statutory duties.

## K. The Algorithmic Cascade, Prime Credit Denials, and Steering to Subprime Markets

59. SPERLONGA's reporting of the fabricated $3,600 credit limit and the resulting debt-utilization ratio that eventually reached 403% acted as an automated trigger that systematically decimated Plaintiff's prime credit relationships.

60. Beginning in the summer of 2024 and continuing into 2026, major credit grantors continuously monitored Plaintiff's files and executed automated adverse actions, resulting in the involuntary closure of multiple long-standing prime consumer and business credit relationships, including accounts held with JPMorgan Chase, Citibank, Barclays Bank, Capital One, and Discover Card.

61. As a direct consequence of Defendants' false data transmissions, conventional banking institutions formally denied Plaintiff business financing because his credit profile no longer met standard institutional underwriting parameters.

62. Completely locked out of the conventional banking system by Defendants' reporting, Plaintiff was forced into the predatory subprime financing market to maintain business operations.

63. In September 2024, following a high volume of simultaneous subprime credit inquiries, Plaintiff was forced out of financial necessity to execute a high-risk merchant cash advance transaction carrying an effective annual percentage rate of approximately 106%.

64. The financial damage caused by Defendants' willful and negligent conduct is ongoing and enduring. Despite the subsequent deletion of the fraudulent tradeline from the credit

bureaus, Plaintiff's personal FICO score remained severely depressed in the sub-600 "POOR" range, freezing his access to conventional financing markets.

## L. The Bad-Faith Dispute Re-Verification

65. In June 2025, Plaintiff filed formal disputes with the national consumer reporting agencies ("CRAs") challenging the reporting of the commercial lease, which triggered automated dispute notifications to SPERLONGA under 15 U.S.C. § 1681i(a)(2).

66. SPERLONGA electronically re-verified the fraudulent tradeline to the CRAs as completely accurate and valid, despite possessing actual, documented knowledge of Plaintiff's pending federal lawsuit challenging that exact data.

67. SPERLONGA executed this re-verification independently and without conducting a reasonable investigation, certifying data fields that were facially and mathematically impossible, including concurrently reporting a significant active payment history while classifying the account as more than 120 days past due.

68. While at least one third-party CRA (TransUnion) subsequently reviewed Plaintiff's physical commercial lease and permanently deleted the tradeline from their consumer wires, SPERLONGA continued to bad-faith re-verify and defend the data's accuracy to maintain commercial collection leverage, causing Equifax to blindly parrot the re-verification and leave the damaging historical reporting active throughout the summer of 2025 and beyond.

## M. Defendants' Consumer-Oriented and Marketplace Deception

69. SPERLONGA deploys its standard Service Agreement and automated data-harvesting practices as a uniform corporate policy across its entire national enterprise, directly impacting the personal credit profiles and financial data security of thousands of consumers and residents within the State of New York.

70. SPERLONGA engages in materially deceptive marketing and public business practices by presenting its data-processing infrastructure as fully compliant with federal data-integrity standards, while intentionally concealing structural programming defects that cause its system to misclassify commercial data as personal consumer obligations.

71. SPERLONGA's deceptive acts, omissions, and automated sweeping policies are not isolated incidents or confined to a private commercial dispute. Rather, they constitute a systemic corporate practice directed at the public leasing marketplace that corrupts the integrity of personal consumer credit profiles for corporate financial gain.

72. Defendants' deceptive marketplace practices directly resulted in broader public harm to the consumer credit ecosystem and caused independent, out-of-pocket economic injuries to Plaintiff and his business operations within this District.

## VI. CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF THE FAIR CREDIT REPORTING ACT
### (MAXIMUM POSSIBLE ACCURACY)
### (15 U.S.C. §§ 1681e(b), 1681n, and 1681o)

**(Against All Defendants)**

73. Plaintiff realleges and incorporates by reference each and every allegation set forth above.

74. At all relevant times, Defendant SPERLONGA operated as a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f), and prepared consumer reports concerning Plaintiff.

75. Pursuant to 15 U.S.C. § 1681e(b), Defendants were statutorily mandated to maintain and follow reasonable procedures to assure the maximum possible accuracy of the information reported on Plaintiff's consumer credit files.

76. Defendants violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures, resulting in the systemic transmission and re-verification of structurally false and impossible credit data, including misclassifying a commercial storefront lease as a consumer debt, fabricating a $3,600 revolving consumer credit limit, and publishing mathematically impossible debt-utilization metrics reaching 403%.

77. Defendant MATT MARTIN is individually liable for these violations under the personal participation doctrine because he personally authorized, directed, and ratified SPERLONGA's failure to maintain reasonable verification procedures despite actual knowledge of the structural data errors.

78. Defendants' violations of 15 U.S.C. § 1681e(b) were willful and reckless within the meaning of 15 U.S.C. § 1681n, or, in the alternative, negligent within the meaning of 15 U.S.C. § 1681o.

79. As a direct and proximate result of Defendants' willful or negligent conduct, Plaintiff suffered severe actual, consequential, and operational damages, including the destruction of his credit score, prime account closures, lockout from conventional business financing, and out-of-pocket financing costs.

80. Defendants are liable to Plaintiff for actual damages, statutory damages, punitive damages, and reasonable costs and attorneys' fees.

## COUNT TWO
## VIOLATION OF THE FAIR CREDIT REPORTING ACT (FAILURE TO REINVESTIGATE) (15 U.S.C. §§ 1681i, 1681n, and 1681o)

**(Against All Defendants)**

81. Plaintiff realleges and incorporates by reference each and every allegation set forth above.

82. Pursuant to 15 U.S.C. § 1681i, upon receiving notice of a consumer dispute from a consumer reporting agency or directly from a consumer, Defendants were statutorily mandated to conduct a free and reasonable reinvestigation into the disputed information within thirty (30) days.

83. Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation of Plaintiff's June and November 2025 disputes. Instead of investigating the blatant

billing data discrepancies, SPERLONGA electronically re-verified the structurally impossible tradeline as completely accurate to national credit repositories while possessing internal documentation confirming the account was an impermissible commercial storefront lease.

84. Defendant MATT MARTIN is individually liable for these violations under the personal participation doctrine because he personally intervened in the dispute file and caused SPERLONGA's compliance staff to cease all communications and refrain from responding to Plaintiff's dispute, thereby suppressing the federally mandated reinvestigation process.

85. Defendants' violations of 15 U.S.C. § 1681i were willful and reckless within the meaning of 15 U.S.C. § 1681n, or, in the alternative, negligent within the meaning of 15 U.S.C. § 1681o.

86. As a direct and proximate result of Defendants' willful or negligent failure to conduct a reasonable reinvestigation, the false tradeline and destructive debt-utilization metrics remained active on the public wire, proximately causing Plaintiff to suffer ongoing actual, consequential, and business capital damages.

87. Defendants are liable to Plaintiff for actual damages, statutory damages, punitive damages, and reasonable *pro se* filing costs.

## COUNT THREE

**VIOLATION OF THE FAIR CREDIT REPORTING ACT**
**(FURNISHER DISPUTE DUTIES)**
**(Pleading in the Alternative under 15 U.S.C. §§ 1681s-2(b), 1681n, and 1681o)**
**(Against All Defendants)**

88. Plaintiff realleges and incorporates by reference each and every allegation set forth above.

89. Pleading in the alternative, to the extent that Defendant SPERLONGA is deemed to have functioned as a "furnisher of information" under 15 U.S.C. § 1681s-2(b) rather than a consumer reporting agency, Defendants were statutorily obligated upon receiving automated dispute notifications from the CRAs to:

(a) Conduct a reasonable investigation with respect to the disputed data;

(b) Review all relevant information provided; *and*

(c) Report the results of the investigation to the CRAs.

90. Defendants violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation, failing to review the underlying commercial lease records, and failing to permanently delete or modify the inaccurate commercial tradeline data upon receiving multiple CRA dispute notifications.

91. Defendant MATT MARTIN is individually liable for these violations under the personal participation doctrine because he personally authorized, directed, and executed the refusal to investigate and correct the disputed data despite possessing actual knowledge of its falsity.

92. Defendants' violations of 15 U.S.C. § 1681s-2(b) were willful and reckless within the meaning of 15 U.S.C. § 1681n, or, in the alternative, negligent within the meaning of 15 U.S.C. § 1681o.

93. As a direct and proximate result of Defendants' willful or negligent conduct as a furnisher, Plaintiff suffered severe actual, consequential, and business capital damages.

94. Defendants are liable to Plaintiff for actual damages, statutory damages, punitive damages, and reasonable *pro se* filing costs.

**COUNT FOUR**
**DECEPTIVE ACTS AND PRACTICES**
**(N.Y. Gen. Bus. Law §349)**
**(Against All Defendants)**

95. Plaintiff realleges and incorporates by reference each and every allegation set forth above.

96. Defendants engaged in consumer-oriented, materially deceptive acts and practices in the conduct of business within the State of New York by marketing and deploying data-harvesting software pipelines under a false premise of statutory compliance, while intentionally concealing structural programming limitations that systematically misclassify commercial debts onto personal consumer profiles.

97. Defendant MATT MARTIN is individually liable for these violations under the personal participation doctrine because he personally authorized and executed the deceptive commercial practices, including executing boilerplate data-ownership contracts and authorizing internal database modifications to mask data errors.

98. Defendants' deceptive business practices were directed at the public leasing marketplace, systemically compromised the integrity of personal consumer identities, and directly impacted the public interest of consumers within the State of New York.

99. As a direct and proximate result of Defendants' willful and knowing deceptive acts, Plaintiff suffered actual, out-of-pocket financial injuries independent of his statutory claims, entitling Plaintiff to actual damages, statutory damages, treble damages, and reasonable *pro se* filing costs pursuant to N.Y. Gen. Bus. Law § 349(h).

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants SPERLONGA DATA & ANALYTICS SYSTEMS LLC and MATT MARTIN, jointly and severally, awarding the following relief:

(a) Actual, compensatory, and consequential damages in an amount to be proven at trial for severe financial injury, loss of credit lines, operational business capital destruction, damage to credit reputation, and emotional distress;

(b) Statutory damages pursuant to 15 U.S.C. § 1681n for Defendants' willful violations of the Fair Credit Reporting Act;

(c) Punitive damages pursuant to 15 U.S.C. § 1681n in an amount to be determined at trial to punish and deter Defendants' reckless and willful statutory misconduct;

(d) Statutory and treble damages pursuant to New York General Business Law § 349(h) for Defendants' willful and knowing deceptive business practices;

(e) Permanent injunctive relief pursuant to New York General Business Law § 349(h) prohibiting Defendants from continuing to report, publish, or furnish the misclassified commercial storefront lease data as a personal consumer obligation to any consumer reporting agency;

(f) Reasonable out-of-pocket costs, filing fees, and disbursements incurred by Plaintiff in the prosecution of this action pursuant to 15 U.S.C. §§ 1681n, 1681o, and New York General Business Law § 349(h); *and*

(g) Such other, further, or alternative relief as this Court deems just, proper, and equitable under the circumstances.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues as a matter of right.

Dated: September 15, 2026
Brooklyn, New York

Respectfully submitted,

*/s/Edward B. Hubbuch*
394 Lincoln Place #A5
Brooklyn, New York 11238
bhubbuch@gmail.com
(646) 544-7597

Plaintiff, *pro se*

**PLAINTIFF'S VERIFICATION**

I, Edward B. Hubbuch, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am the Plaintiff in the above-captioned matter, that I have read the foregoing Initial Verified Complaint, and that I know and fully understand the contents thereof. The factual allegations contained therein are true and accurate to the best of my own personal knowledge, information, and belief. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 15TH day of SEPTEMBER, 2026, in Brooklyn, New York.

Edward B. Hubbuch

# EXHIBIT A

DocuSign Envelope ID: D844EC00-FFBA-4EE4-847D-F01710474851

SPERLONGA Data & Analytics

# SERVICE AGREEMENT

THIS AGREEMENT (this "Agreement") is made this 23rd day of December, 2021 (the "Effective Date"), by and between Sperlonga Data and Analytics Systems, LLC ("SDA"), with its principal place of business located at 6800 Owensmouth Ave., Suite 135, Canoga Park, CA 91303 and Watermark Capital Management (the "Partner"), with its principal place of business located at 543 Bedford Avenue suite 264 and taxpayer identification number (TIN) of 462726473

## I. RECITALS

1.01 SDA provides payment reporting services for homeowner associations, cooperative housing complexes, condominium associations and/or association management companies, landlords and/or property management companies, developers, timeshare operators and/or timeshare management companies. As part of the data processing services, SDA will obtain information about the payment history of property unit owners and/or Tenants ("Units") and provide the information to Credit Reporting Agencies (as defined in below) for inclusion in consumer reports ("**Payment Reporting Services**"), including data gathering for the Monthly Data Report (as defined below). Using eOscar software, SDA provides a customer service operation that manages Unit owner inquiries and disputes regarding the Monthly Data Report.

1.02 Partner is a management company for homeowner associations, cooperative housing complexes, and/or condominium associations, landlords and/or property management companies, developers, timeshare operators and/or timeshare management companies, or an owner of rental property which rents Units to tenants (collectively, referred to as "**Associations/Properties**," or individually, as an "**Association/Property**") and manages and tracks the payment history of property Unit owners and/or Tenants to the Associations/Properties. It further manages the data which is owned by its clients or itself.

1.03 For each Association/Property that Partner has enabled to report through their management software system, or delivered electronically to SDA, or as listed on Schedule A or B, SDA shall provide data management, extraction, collection and reporting services. Partner will work with SDA to facilitate extraction of all data. SDA will submit data required to report to the Credit Reporting Agencies such as Equifax, Experian, Dunn and Bradstreet and TransUnion ("**Credit Reporting Agencies**") on a monthly basis ("**Monthly Data Report**").

1.04 SDA provides an indemnity to Partner as stated in Section 3.05 below.

1.05 SDA and Partner desire to enter into this Agreement upon the following terms and conditions:

## II. RIGHTS AND OBLIGATIONS

2.01 SDA grants Partner the non-exclusive, non-assignable and revocable right to provide the Payment Reporting Services to Associations/Properties.

2.02 Partner shall submit data electronically to SDA or grant SDA access to Partner's database for purposes of setting up, collecting, formatting, testing, extracting, reporting and storing the data in a data warehouse ("**SDA's Data Warehouse**"). Once a copy of the data from Partner's database or electronic submission for an Association/Property is incorporated into SDA's Data Warehouse, the data will become SDA's exclusive property.

2.03 SDA may use data in SDA's Data Warehouse for any purpose consistent with applicable federal, state and local laws, rules and regulations, including, without limitation, all privacy and data protection laws. Credit Reporting Agencies will use the data for consumer credit reporting and other customary credit reporting agency practices as permitted under federal and state laws and regulations, including the FCRA (as defined below).

2.04 In connection with the Payment Reporting Services, Partner grants SDA authorization and license to use, reproduce, communicate and publish the name and logo of Partner on SDA's website and in any other marketing and advertising communications, announcements, press releases, articles and publications prepared by or on behalf of SDA. SDA shall also have the right to cause its representatives at mutually agreeable times to assist with marketing activities, including making presentations about the Payment Reporting Services.

2.05

A. Partner agrees to exercise commercially reasonable efforts (but in no event will such efforts be less than the standard required by the Fair Credit Reporting Act ("**FCRA**") (15 U.S.C. 1681 *et seq.*) and all other applicable laws and regulations to provide the Credit Reporting Agencies accurate and reliable payment data from its management system about Unit owners. Such information will be furnished and updated

DocuSign Envelope ID: DB44EC00-FFBA-4EE4-847D-F0771D474951

SPERLONGA Data & Analytics

no less frequently than at monthly intervals, unless otherwise agreed in writing. Partner certifies they will use commercially reasonable efforts to furnish complete and accurate information to SDA and Credit Reporting Agencies. The information furnished to SDA shall include as much of a Unit owner's identifying information (such as name and address) that is available to Partner.

B. Partner certifies that Partner will comply with the Credit Reporting Agencies' policies and procedures for data contributors, as may be changed from time to time, a copy of which can be found on the Credit Reporting Agencies' websites.

C. Upon request by SDA, Partner shall re-verify disputed information using the dispute verification system managed by SDA. Partner certifies that all information supplied by it in response to a consumer dispute verification request sent to it by SDA shall be complete and accurate. Partner will implement procedures to avoid re-reporting data that is inaccurate.

D. Partner shall provide SDA with written notice immediately if any data furnished by Partner to SDA is inaccurate or misleading.

## III. TERMS AND CONDITIONS

3.01 The initial term ("**Initial Term**") of this Agreement shall be for one (1) year from the date hereof, and, unless sooner terminated, shall be automatically renewed for successive one (1) year periods, unless either party notifies the other party in writing of its intention not to renew the Agreement within ninety (90) days of the end of the Initial Term or any renewal term. Termination shall not relieve either party of obligations incurred prior thereto. This Agreement may be terminated under the following circumstances: (i) (i) by either party in the event the other party (x) terminates or suspends its business; (y) becomes subject to any bankruptcy or insolvency proceeding under federal or state law or statute, or has been liquidated, voluntarily or otherwise; or (z) becomes insolvent or subject to direct control by a trustee, receiver or similar authority, and (iii) by SDA upon Partner's inability or unwillingness to send Fees or Taxes (as defined below) payable by Partner at the direction of and on behalf of each Association/Property that Partner has submitted for reporting, if Partner fails to cure such default within thirty (30) days after the receipt of written notice from SDA. Each party's rights and obligations under this Agreement shall be perpetual as to trade secrets.

3.02 For SDA's performance under this Agreement, Partner shall, at the direction and on behalf of each Association/Property that Partner has submitted for reporting, allow SDA to charge to the credit card on file the following fees ("**Fees**"):

A. *Maintenance Fee.* One Hundred Dollars and 00/100 ($100.00) per month ("**Maintenance Fee**") for the overall operation and maintenance of the Payment Reporting Service for the Partner. This Maintenance Fee covers all Partner's Associations/Properties.

B. *Fee for Payment Reporting Services.* One Dollar and 00/100 ($1.00) per property unit lease ("**Unit**") per month for any leased Unit ("**Monthly Fee**") that is enabled through the Partner's management software or submitted to SDA.

C. *Fee for Setup.* Partner shall, at the direction and on behalf of each Association/Property that Partner has submitted for reporting, allow SDA to charge to the credit card on file an amount equal to One Dollar and 25/100 ($1.25) per Unit to connect to Partner's database, test the data extraction, validate the utilization of each pertinent data field and initiate Service ("**Setup Fee**").

D. *TransUnion Reporting Fee.* Two Hundred Fifty Dollars and 00/100 ($250.00) optional onetime setup fee to report Partner's Association/Property to TransUnion ("**TransUnion Fee**") This fee will be charged to the credit card on file. Please check ____ YES include TransUnion as part of my service or ______ NO do not include TransUnion.

E. *Fee for Changing Management Software Provider.* Partner shall, at the direction and on behalf of each Association/Property that Partner has submitted for reporting, allow SDA to charge an amount equal to One Dollar and 00/100 ($1.00) per Unit or Two Hundred Fifty Dollars and 00/100 ($250.00), whichever is greater ("**Modification Fee**").

F. *Annual Fee Increases.* The Monthly Fee shall be increased three percent (3%) annually or adjusted to reflect the percentage change in the Consumer Price Index, whichever is greater, on January 1st of each calendar year.

G. *Taxes.* Partner shall, at the direction and on behalf of each Association/Property that Partner has submitted for reporting, pay any applicable taxes that may be levied or based upon this Agreement or upon the Payment Reporting Services provided by SDA hereunder, including, without limitation, sales, use, nonresident, value-added, excise and similar taxes ("**Taxes**"), but excluding taxes levied or imposed upon the income or business privileges of SDA. To the extent that SDA is required to collect and remit any Association/Property Taxes, SDA shall invoice Association/Property the amount of any such Taxes.

H. *Invoices.* Charges for the Monthly Fees, the Setup Fee, and Taxes (if applicable) will be invoiced ("**Monthly Invoice**") monthly and will be charged to the credit card on file within ten (10) days of the date of the Monthly Invoice and disbursed from funds of the relevant Association/Project. If Partner is unable or unwilling to send any of the Fees or Taxes, if applicable, as of the due date specified in this Agreement, then the amount owed shall accrue interest at an annual rate equal to one and one-half percent (1.5%) per month, from and after

DocuSign Envelope ID: DB44EC00-FFBA-4CE4-847D-F0771047493 I

SPERLONGA Data & Analytics

the date such default occurred. Partner shall notify SDA within twenty-four (24) hours of becoming aware that (i) an Association/Property disputes any Monthly Fee or other charge relating to the Services, (ii) an Association/Property has insufficient funds to pay the Monthly Fee, or (iii) the Monthly Fee will not be paid when due for any reason whatsoever. All undisputed amounts shall be payable when due.

3.03 All notices and other communications hereunder shall be in writing and delivered personally or sent by a nationally recognized overnight courier to the following address or number (or at such other address or number for a party as will be specified by like notice):

| To SDA: | To Partner: |
|---|---|
| Sperlonga Data Analytics and Systems, LLC<br>6800 Owensmouth Ave., Suite 135<br>Canoga Park, CA 91303<br>Attn: CEO | Watermark Capital Management<br>543 Bedford Ave suite 264<br>Brooklyn, NY 11211<br>Att: Kahan |

3.04 The relationship between the parties established by this Agreement shall be solely that of independent contractors.

3.05 SDA agrees to indemnify and hold Partner harmless from any liability, loss, injury, damage or expenses incurred or threatened against Partner, arising from any unaffiliated third-party claim that may result or stem from (i) SDA's or Partner's violation of provisions in the FCRA; (ii) any third party intellectual property introduced by SDA that violates applicable law or the rights of any third party; or (iii) data breaches caused solely by SDA; but in each case, only to the extent that such liability, loss, injury, damage or expenses incurred or threatened against Partner are not caused, in whole or in part, by (x) the fraud, gross negligence or willful misconduct of Partner or its Representatives (as defined below), (y) any misrepresentation by Partner in connection with this Agreement, or (z) Partner's breach of or failure to comply with the representations, warranties and covenants contained in this Agreement. SDA is authorized at any time and from time to time, to the fullest extent permitted by law, to set-off and apply any Fees due and not paid by Partner against any amounts due by SDA under this Section. Partner shall promptly notify SDA in writing of any claim or threatened claim or proceeding which may be covered by an indemnity hereunder. SDA, at its expense, shall assume the defense of such claim or proceeding, including retaining counsel reasonably satisfactory to SDA. Partner, at its expense, shall have the right to retain its own counsel relating to any such claim.

3.06 Partner and SDA agree that SDA's total liability for all claims under this Agreement shall be capped at one (1) times the maximum amount of Net Fees paid to SDA during one (1) year of the Term. The liability cap referenced in this Section 3.06 shall not apply to SDA's indemnification obligation in Section 3.05.

3.07 Partner and SDA agree that during the term of this Agreement, each of the parties, or its affiliates, and their respective employees, officers, directors, partners, shareholders, agents, attorneys, accountants or advisors (collectively, referred to herein as a party's "Representatives"), may have access to certain of the other party's confidential and proprietary information, which are disclosed prior to or after the Effective Date by a party to the other party or its Representatives, that is of a nature that a commercially reasonable person would understand to be confidential, proprietary or a trade secret (collectively, the "**Confidential Information**"). Each party retains its entire right, title and interest, including all intellectual property rights, in and to all of its Confidential Information. Any disclosure of Confidential Information hereunder shall not be construed as an assignment, grant, option, license or other transfer, express or implied, of any such right, title or interest to the recipient or any of its Representatives. The term "Confidential Information" does not include account information pertaining to Unit owners which will be disclosed to third parties pursuant to this Agreement by SDA, information which becomes generally available to the public other than as a result of disclosure by the owner of the information or its Representatives, but shall be deemed to include the Fees and any passwords or identification codes, access codes, modem dial-up numbers and similar items. Each party shall keep confidential and shall not divulge to any third party (other than officers, employees, agents or contractors who have a need to know) Confidential Information without the owner of such Confidential Information's prior written consent. Each party further agrees that the Confidential Information will not be used by it or its Representatives in any way detrimental to the other party. In the event that either party is requested or required to disclose any Confidential Information, it is agreed that such party will provide the other party with prompt notice of such request(s) so that the other party may seek an appropriate protective order and/or waive compliance with the provisions of this Section, in its sole and absolute discretion. Both parties acknowledge that irreparable damage will occur if any party breaches the terms and provisions of this Section. If any party breaches or threatens to breach any of the provisions of this Section, the other party shall be entitled to all the rights and remedies available to it in law or equity. The parties' obligations under this Section shall survive termination of the Agreement and shall remain in full force and effect until the date that is two (2) years from the termination date.

3.08 No news releases or public announcements relating to this Agreement shall be made by Partner without prior written consent of SDA. The restrictions of this paragraph shall continue in effect after termination or expiration of this Agreement.

3.09 Partner shall not provide the data contained in Partner's database for each Association/Property to any credit reporting agency, credit bureau, or data management company that provides the same or similar credit reporting services as SDA while Partner is under contract to receive

DocuSign Envelope ID: DB44EC00-FFBA-4EE4-847D-F077164749B1

SPERLONGA Data & Analytics

Payment Reporting Services outlined herein from SDA and continuing for a one (1) year period after the expiration or termination of the Term hereof.

3.10 SDA and Partner acknowledge and agree that (i) neither Credit Reporting Agencies nor their Representatives shall be liable to SDA or Partner for any loss or injury relating to, arising out of, or caused in whole or in part by, their acts or omissions, even if negligent, relating to Credit Reporting Agencies' or their Representatives' services relating to this Agreement and (ii) in no event will Credit Reporting Agencies or their Representatives be responsible for consequential, incidental, indirect, exemplary or special damages, including lost profits (even if they have been advised of the possibility or likelihood of such damages).

3.11 This Agreement shall be governed by, interpreted and enforced in accordance with the law of the State of Texas, without reference to the principles of conflict of laws. Except for suits brought solely for injunctive relief (suits solely for injunctive relief may be brought in any court of competent jurisdiction), suits under this Agreement shall only be brought in a court of competent jurisdiction in the State of Texas.

A. Each party represents and warrants that it has the requisite power and authority to execute, deliver, and perform its obligations under this Agreement.

B. Partner represents and warrants that Partner has the full legal right to provide the data to SDA.

C. Partner agrees that to the maximum extent permitted by law, Credit Reporting Agencies and their Representatives provide credit reporting services and SDA provides Payment Reporting Services on an "as is" basis. SDA and Credit Reporting Agencies disclaim all promises, representations, guarantees and warranties whether express, implied or statutory regarding Credit Reporting Agencies' services and the Payment Reporting Services.

D. Partner acknowledges and agrees that, in connection with the services provided by SDA hereunder or under the integration agreement between SDA and Management Software Provider ("MSP"), neither MSP nor SDA, on behalf of MSP, has made any representation or warranty as to the SDA Application, any documentation and/or sample code relating to the MSP Application or MSP's trademarks, logos, or service marks provided or made available to SDA ("MSP Documentation"), the MSP Software, the MSP's computer and network systems, and any computer or network systems used by MSP to host an MSP Application or MSP Software, accessed by any SDA Application ("MSP Systems"), the MSP's trademarks, logos, and services marks, or otherwise. SDA has not made any statement that any SDA Application is "certified" or has been reviewed by MSP.

3.12 SDA will maintain commercially reasonable security procedures and practices suitable to protect SDA's Data Warehouse from unauthorized access, destruction, use, modification or disclosure. SDA will, at its own expense, take all steps to identify, prevent and mitigate the effects of any security breach. SDA and Partner acknowledge and agree that Credit Reporting Agencies do not assume any responsibility or liability for the security of data prior to the time such Credit Reporting Agencies receive such data.

## IV. MISCELLANEOUS

If any portion of this Agreement is held or determined to be invalid or unenforceable, the remaining provisions shall continue in full force and effect as if this Agreement had been executed with the invalid portion eliminated. Either party may at any time waive compliance by the other party with any covenant or condition contained in this Agreement. No such waiver, however, shall be deemed to constitute waiver of any such covenant or condition in any other circumstance or the waiver of any other covenant or condition. Neither party may assign any of its rights or delegate any of its obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld, delayed or conditioned. Notwithstanding the foregoing, (i) either party shall have the right to assign this Agreement and its rights and obligations hereunder without the prior written consent of the other party to any affiliate of such party, with advance written notice, and (ii) SDA shall have the right to assign this Agreement to an entity which acquires all or substantially all of the assets of SDA or to any successor reorganization, reincorporation, merger or acquisition involving SDA. The term "assign" shall mean any assignment or transfer for value or otherwise, of the Agreement, and shall include any sale, assignment or transfer for value or otherwise, in the controlling interest of a party. The phrase "controlling interest" as used in the preceding sentence, shall mean either: (x) the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the shares or membership interests of such party (through ownership or by contract)]; or (y) the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such party. All of the covenants, conditions and obligations contained in this Agreement shall be binding upon and inure to the benefit of the respective permitted successors and assigns of the parties. In the event either party consents to an assignment of this Agreement by the other party, no further assignment shall be made without the express consent in writing of such other party, unless such assignment may otherwise be made without such consent pursuant to the terms of this Agreement. If Partner decides to assign this Agreement, Partner shall give SDA fifteen (15) business days' prior written notice of such decision, Partner and SDA shall work with the Credit Reporting Agencies to obtain credentialing of such assignee by the Credit Reporting Agencies, and such assignment shall not take effect until such assignee has obtaining credentialing from the Credit Reporting Agencies. The parties agree that this Agreement, including all documents incorporated herein by reference, shall constitute the entire agreement and understanding between the parties hereto and shall supersede and replace any and all prior or contemporaneous communications, representations, agreements or understandings of any kind, whether written or oral, relating to this Agreement. This Agreement may be executed in any number of counterparts, each of which when so executed and

DocuSign Envelope ID: D844EC90-FFBA-4EE4-847D-F077184T4931

SPERLONGA Data & Analytics

delivered shall be deemed an original, but all of which shall together constitute one and the same agreement. For purposes of determining the enforceability of this Agreement, facsimile or .pdf signatures shall be deemed originals.

Partner represents and warrants that it has the full power and authority to bind each Association/Property that Partner has enabled to report through their management software system, or delivered electronically to SDA, or as listed on Schedule A or B to every obligation under this Agreement and Partner's signature to this Agreement will bind each Property.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers as of the date and year indicated above. Partner represents that the total number of Associations/Properties under Partner's management and the total number of Units within such Associations/Properties is as set forth next to Partner's signature line below.

Watermark Capital Management

By: Malky Kahan

Print Name: malky kahan

Title: Agent

Date of Birth: 12/14/1989

(Authorized Officer)

Sperlonga Data and Analytics Systems, LLC

By: MATT MARTIN

Print Name: Matt Martin

Title: CEO

As of the Effective Date, Total Number of:

Associations/Properties Under Company's Management: 100

Units Within Such Associations/Properties: 2000

Target Start Date: 2/01/2022

Current Management or Accounting Software: Rent Manager

Credit Card Information

Type 0

Card # 0

Exp 0

CVV 0

Billing Address 543 Bedford ave suite 264

City Brooklyn State NY Zip 11211

# EXHIBIT B

EDWARD B. HUBBUCH

394 LINCOLN PLACE, APT. A5
BROOKLYN, N.Y. 11238
(646) 544-7597
bhubbuch@gmail.com

**VIA EMAIL & CERTIFIED MAIL**

November 20, 2025

Mr. Matt Martin, Founder & Chairman
Mr. Jed Avillano, Chief of Staff
Sperlonga Data & Analytics Systems, LLC
6800 Owensmouth Ave., Suite 135
Canoga Park, Calif. 91303

***Re: Formal Litigation Hold pursuant to S.D.N.Y. No. 25-CV-406-JMF-SLC***

Dear Messrs. Martin and Avillano:

This letter serves as a formal Litigation Hold Notice concerning Sperlonga Data & Analytics Systems, LLC ("Sperlonga") and its past and ongoing involvement with Brooklyn, New York-based Watermark Capital Group LLC (d/b/a "Watermark Capital Management") regarding the credit reporting activities concerning me.

I am the Plaintiff in an active federal lawsuit — *Hubbuch v. Kohn, et al.*, Case No. 1:25-CV-4924-JMF-SLC (S.D.N.Y.) — against Watermark Capital Group LLC and its principals in United States District Court for the Southern District of New York. This lawsuit concerns, among other things, the fraudulent framing and furnishing of my commercial restaurant lease as a mortgage-like, $336,000 consumer loan on my personal credit report, as well as unlawful debt collection practices under the Fair Debt Collection Practices Act ("FDCPA"), and related common-law claims leading to significant financial, reputational, and emotional harm.

During the course of initial discovery in *Hubbuch v. Kohn, et al.*, I have recently obtained evidence (including a Service Agreement dated December 23, 2021, between Sperlonga and Watermark Capital Management, and internal email correspondence) that clearly demonstrates Sperlonga's direct and integral role as a "furnisher" of information concerning me to various Credit Reporting Agencies ("CRAs"), including TransUnion, Experian, Equifax, and Innovis. This evidence includes Sperlonga's specific FCRA duties, Sperlonga's receipt of my disputes, and Sperlonga's subsequent actions/inactions regarding the dispute and re-verification process despite clear warnings of potential FCRA non-compliance.

Please be advised that if *Hubbuch v. Kohn, et al.*, is not resolved at the formal settlement conference scheduled before Magistrate Judge Sarah L. Cave on December 9, 2025, I intend to

immediately seek leave from District Judge Jesse M. Furman to file a Third Amended Complaint that will add Sperlonga as a defendant in this existing action.

Given my reasonable anticipation of litigation against Sperlonga, you are hereby instructed to immediately suspend any current document destruction policies and implement a formal Litigation Hold to preserve all documents and Electronically Stored Information ("ESI") that are or may be relevant to these matters.

This includes, but is not limited to, information concerning:

1. **Any and all agreements, contracts, amendments, or understandings between: Sperlonga and Watermark Capital Group LLC d/b/a "Watermark Capital Management LLC"; 788 Franklin Realty LLC; Yoel Kohn a/k/a Joel Kohn a/k/a Joe Kohn; and/or any other entities related to Watermark Capital Group LLC d/b/a "Watermark Capital Management LLC" (including the Service Agreement dated December 23, 2021);**

2. **All communications (internal and external, including emails, text messages, instant messages, and recorded discussions) related to: me (Edward B. Hubbuch) and/or the aforementioned fraudulent tradeline; my commercial lease at 569 Lincoln Place in Brooklyn, N.Y.; the alleged "mortgage-like personal loan" and/or the reporting thereof; and any disputes, inquiries, or legal actions related to this account;**

3. **All records of data furnished by Sperlonga (or on behalf of Watermark Capital Group LLC d/b/a "Watermark Capital Management") to any CRA (TransUnion, Experian, Equifax, Innovis, Dunn & Bradstreet, *etc.*) concerning me, including reporting histories, payment statuses, and delinquencies;**

4. **All records relating to my dispute of the fraudulent tradeline beginning in June 2025, including internal investigations, communications with Watermark Capital Group LLC d/b/a "Watermark Capital Management," and responses to CRAs;**

5. **All internal policies, procedures, and training materials related to FCRA compliance, data accuracy, dispute investigation, and reporting tenant information to CRAs;**

6. **All internal communications or assessments regarding the legality or appropriateness of reporting commercial lease obligations as consumer debt, or the creation and usage of the "SDA/Watermark Capital Management" entity or the 30 North Gould Street address in Sheridan, Wyoming, for credit reporting purposes;** and

7. **Any documents or communications related to the alleged consumer debt collection attempt via FDCPA-styled letters concerning my commercial lease.**

This preservation obligation extends to all physical documents and all ESI regardless of format or location, including but not limited to: servers, desktop computers, laptop computers, mobile devices, external hard drives, USB drives, backup media, cloud storage, email accounts, voicemails, shared drives, and any other storage media. This includes metadata associated with these items.

You are requested to:

- **Immediately identify and notify all individuals who may possess or control such information;**
- **Ensure that no potentially relevant information, including ESI, is altered, deleted, or destroyed;**
- **Suspend all routine document retention/destruction policies for the information described above;** and
- **Take all reasonable steps to prevent the loss or corruption of ESI, including ensuring that backup tapes are preserved and not overwritten.**

Please forward this notice to your general counsel, any internal or external counsel representing Sperlonga, and all employees, agents, or third parties who may be custodians of information described herein. Failure to preserve this evidence could result in severe sanctions, including adverse inference instructions, monetary fines, or the striking of defenses, once litigation ensues.

You are advised to govern yourselves accordingly.

Sincerely,



Edward B. (Bart) Hubbuch

cc: Andrew M. Tilem, Esq.,
*Counsel for Watermark Capital Group LLC d/b/a "Watermark Capital Management"*

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **ADVANCED TECHNOLOGY GROUP, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SPERLONGA DATA & ANALYTICS SYSTEMS, LLC AND DIGITFORGE ENTERPRISES, LLC,**<br><br>**Defendants.** | **Case No. 3:17-cv-3270-BT**<br><br>**JURY TRIAL** |

## AGREED STIPULATED PERMANENT INJUNCTION AND FINAL JUDGMENT ORDER

Plaintiff Advanced Technology Group, Inc. ("**ATG**"), and Defendant Sperlonga Data and Analytics Systems, LLC ("**Sperlonga**"), and Defendant DigitForge Enterprises, LLC ("**DigitForge**") (Sperlonga and DigitForge are collectively "**Defendants**") (ATG and Defendants are collectively the "**Parties**") have filed this Agreed Stipulated Permanent Injunction and Final Judgment Order ("**Permanent Injunction and Order**"). Having considered the Parties' filings, the applicable law, the relevant facts, the parties' agreement, and being otherwise fully apprised of the premises, **THE COURT HEREBY GRANTS THE RELIEF REQUESTED IN THIS PERMANENT INJUNCTION AND ORDER AND ENTERS THIS PERMANENT INJUNCTION AND ORDER.**

This Permanent Injunction and Order is entered under the Court's authority under the Federal Rules and the statutory authority under the Defend Trade Secrets Act 18 U.S.C. §1836(b)(3)(A). The Court notes that the parties agree to the statements in this Permanent

Injunction and Order. This Permanent Injunction and Order replaces the preliminary injunction entered into by the Court.

## I. THE PARTIES' STIPULATIONS

A. This Court has jurisdiction over the Parties and this matter.

B. The Amended Complaint alleges that Defendants misappropriated trade secrets under 18 U.S.C. §1836(b), tortuously interfered with contracts, and engaged in conspiracy.

C. ATG sells a commercial software product called Complete Control for Communities product (**"C3"**) that is used by property management associations. In 2017, two ATG C3 customers—SBB Management Company (**"SBB"**) and the Association of Property Owners of Sleepy Hollow Lake, Inc. (**"Sleepy Hollow"**)—provided copies of their respective C3 databases (the **"SBB Copy"** and the **"Sleepy Hollow Copy"**) to Sperlonga and its contract software developer DigitForge.

D. ATG alleges, among other things, that: (i) the SBB Copy and Sleepy Hollow Copy contain ATG's confidential information and trade secrets, including, without limitation, ATG's proprietary stored procedures and a proprietary data structure (also called a schema); (ii) this information represents the valuable and protected property of ATG; (iii) Defendants accessed the SBB Copy and the Sleepy Hollow Copy and learned ATG's trade secrets; (iv) Defendants also discussed ATG's C3 with SBB and learned additional secrets concerning C3's operation: (v) Defendants did not have ATG's permission, in any sense, to obtain information regarding C3, including obtaining the SBB Copy or the Sleepy Hollow copy or learning additional information from SBB; (vi) Defendants also did not have ATG's permission to use or disclose information learned regarding C3; and (vii) Defendants used the knowledge they gained from SBB and from accessing and

using the SBB Copy and the Sleepy Hollow Copy to create additional works, including computer programs and documents. Defendants deny these allegations.

E. In settlement and compromise of the claims raised in the above-captioned lawsuit, the Parties have jointly moved the Court to enter this Permanent Injunction and Order.

F. Defendants hereby waive their ability to challenge or appeal this Permanent Injunction and Order.

## II. PERMANENT INJUNCTION AND ORDER

After considering the pleadings, the facts of the case, the applicable law, and being otherwise fully apprised of the premises, the Court finds that following relief is appropriate. This Permanent Injunction and Order, shall remain in force until amended by subsequent order of the Court.

### A. ORDER THAT DEFENDANTS TAKE CERTAIN CORRECTIVE ACTIONS

**THE COURT HEREBY ORDERS** Defendants, their officers, agents, servants, employees, and all other persons in active concert or participation with any of them who receive actual notice of this Permanent Injunction and Order, to:

1. Inventory, identify, sequester and preserve any instance or copy (whole or partial) of a C3 database (including without limitation, the SBB Copy and the Sleepy Hollow Copy) or its structure, layout, schema, organization, stored procedures, or any part thereof, regardless of whether such instance or copy is partial or has been modified (a "**C3 Database**"). The term "C3 Database" shall be interpreted broadly and shall include, but not be limited to, any source code, database, database schema, email, log file, document, or chat message that contains information obtained, directly or indirectly, from any C3 database;

2. Inventory, identify, sequester and preserve all things derived from or based upon any instance or copy (whole or partial) of a C3 Database;
3. Disclose and provide ATG a copy of anything inventoried, identified, sequestered, or preserved under the above paragraphs, including a description of where precisely such copies and/or information is located;
4. Upon written instruction of ATG's counsel, permanently destroy anything so inventoried, identified, sequestered or preserved under the above paragraphs, including destroying any backup copies of such things;
5. Provide, through a corporate representative, a sworn notarized statement and a record, such as by video recording and electronic logs that these steps have been accomplished;
6. Provide actual notice of this Permanent Injunction and Order to their officers, agents, assignees, attorneys, servants, employees; and
7. Complete the provisions of this Section II.A(1)–(6) within 30 days of the entry or issuance of this Permanent Injunction and Order.

**THE COURT FURTHER ORDERS** Defendants to use their authority, including their contractual authority over current and former employees or contractors, to enforce compliance with this Permanent Injunction and Order.

**B. INJUNCTION AGAINST ANY FURTHER USE OR DISCLOSURE**

**THE COURT PERMANENTLY ENJOINS** Defendants; Defendants' officers, agents, assignees, servants, and employees;[1] Defendants' successor companies; entities owned or

[1] These persons (each of whom Defendants shall have sign Exhibit A) shall include, wherever referenced in this Order at least, Matt Martin, Andrew Gladston, Jodee McGrath, Dawn Booth, Michael Guess, Brent Stokes, Henry Negrete, Grant Jackson, Donald R. Disbro, Rebecca Bright, Elda Gonzalez, Michael Wolski, Tej Patel, Heather

controlled by Defendants or their officers, agents, assignees, servants, or employees; and furthermore enjoins all other persons in active concert or participation with any of the foregoing persons who receive actual notice of this Permanent Injunction and Order, from, without express, written permission from ATG:

1. Using or disclosing
    a. Any C3 Database;
    b. Anything learned from having had access to, or use of any C3 Database; and/or
    c. Anything based upon or derived from any C3 Database.

## C. AGREED INJUNCTION AGAINST COMPETING WITH ATG

**THE COURT ENJOINS** Defendants; Defendants' officers, agents, assignees, servants and employees; Defendants' successor companies; entities owned or controlled by Defendants or their officers, agents, assignees, servants, or employees; and furthermore enjoins all other persons in active concert or participation with any of the foregoing persons who receive actual notice of this Permanent Injunction and Order, from, without express, written permission from ATG:

1. Engaging, directly or indirectly in any business in the United States that provides HOA software or software-based services that assist in the management of communities (including without limitation, financial management, accounts receivable, accounts payable, budgeting, reporting, delinquency processing, association management (including work orders, maintenance, architectural, and

O'Manoaigh, and Fred Pandolfi; however Andrew Gladston, Jodee McGrath, Dawn Booth, Henry Negrete, and Donald R. Disbro shall be excepted for purposes of § II.C only.

covenant tracking) (**"Community Management Features"**)—or payment of fees related to communities (such as assessments, violations, and other charges)).

2. After 5 years of this Permanent Injunction and Order being entered (but at no point before), Defendants may engage in a business described in Paragraph II.C.1 if and only if the product contains 4 or fewer Community Management Features and, if the product is offered for sale within 8 years of this Order being entered, that product is disclosed to ATG in writing within 180 days before any such product is offered for sale.

3. After the earlier of 8 years of this Permanent Injunction and Order being entered or 5 years of no material evidencing non-compliance this Permanent Injunction and Order being found in an audit (but at no point before), Defendants may start or join (through merger, acquisition or otherwise) a business that competes with ATG (as described in Paragraph II.C.1). After this time period is completed, Sperlonga may start or join such a business, but in no event shall Michael Wolski or Tej Patel be allowed to work, directly or indirectly for such a business.

4. If any subsequent audit finds material evidencing non-compliance with this Permanent Injunction and Order, the timing in Paragraphs II.C.2 and II.C.3 shall be reset and shall count forward from the date of the destruction of the material evidencing non-compliance with this Order.

5. Notwithstanding the above portions of § II.C, Defendants may offer a stand-alone product or service that reports payment data to credit reporting agencies, generates analytics relating to payment data, or provides products or services specific to collection of accounts receivable, assessments, violations, and other

delinquent charges. Defendants' stand-alone product may receive data from third-parties periodically.

6. Nothing in this Agreed Permanent Injunction and Order shall prohibit the parties from entering into a written and signed agreement after this Permanent Injunction and Order is entered or from jointly moving the Court to modify this agreement.

**D. DEFENDANTS' ACKNOWLEDGMENTS**

**THE COURT FURTHER ORDERS** that Defendants obtain acknowledgments of receipt of this Permanent Injunction and Order from:

1. Each Defendant, within 14 days of the entry of this Permanent Injunction and Order shall deliver a copy of this Permanent Injunction and Order to: (1) all principals, officers, directors, and LLC managers and members, including Matt Martin, Michael Wolski, and Heather O'Maonaigh; (2) all employees, agents, contractors, and representatives who participated in conduct related to the subject matter of the Permanent Injunction and Order, including Rebecca Bright; (3) any former employees, agents, contractors, and representatives who participated in conduct related to the subject matter of the Permanent Injunction and Order, such as Tej Patel; (4) each individual who possessed, had access to, or considered any C3 Database.
2. Each individual or entity to which a Defendant delivered a copy of this Permanent Injunction and Order that Defendant must obtain, within thirty days, a sworn, notarized statement (**Exhibit A**). A copy of each statement shall be filed with the Court.

**E. ATG'S PERIODIC AUDITS TO VERIFY COMPLIANCE**

**THE COURT FURTHER ORDERS** Defendants to allow ATG to verify compliance with this Permanent Injunction and Order from time to time as follows:

1. After Defendants have taken the corrective actions described in §II.A, Defendants shall permit an independent auditor of ATG's choosing to inspect Defendants' documents, communications, source code and systems upon 30-days, written notice. This provision shall apply to any company or entity that acquires all, or substantially all assets (including the source code or databases or information) of any Defendant. This independent auditor shall sign the Protective Order (Dkt. No. 22) and Order Amending Protective Order (Dkt. No. 79) in this case and shall not be employed, other than as an auditor or as an expert, by ATG or any parent, subsidiary or affiliate of ATG.
    a. Any such inspection shall be conducted during normal business hours (that shall be from at least 9 a.m. to 5 p.m.).
    b. Any such audit shall not last more than 7 business days;
    c. Defendants shall provide all reasonable cooperation to the auditor;
    d. Defendants will permit the auditor to inspect Defendants' documents, communications, source code and systems;
    e. The auditor shall not unreasonably interfere with Defendants' day-to-day operations;
    f. The auditor shall treat any and all of Defendants' information or materials reviewed in conjunction with such inspection as AEO under the Protective Order.
    g. If the auditor identifies an aspect of Defendants' documents, communications, source code or systems that the auditor believes evidences non-compliance with this Permanent Injunction and Order, the auditor shall provide prompt notice to Defendants and allow Defendants the opportunity to cure the non-compliance within three business days while the auditor is present. The auditor shall also be

permitted to make a copy of that evidence of non-compliance and, if applicable, its destruction, and shall make a written report regarding its findings, both of which shall be treated as AEO material under the protective order in this case;

h. Plaintiff shall bear the cost of the auditor's inspection;

i. If the auditor identifies material that indicates that the Permanent Injunction and Order has not been complied with or the inspection of the auditor is obstructed, the parties shall meet and confer in good faith.

   i. If the parties agree that the material or obstruction evidences non-compliance with the Court's Permanent Injunction and Order (subject to the provisions of this order, including iii (below)) or if the material has already been destroyed under E.1.g (above), the Defendants shall bear the cost of the auditor's inspection and the material shall be permanently destroyed (unless it has been destroyed under E.1.g). Unless the auditor has already verified destruction under E.1.g, within fourteen days of receiving notice of the destruction (or at the next reasonably convenient time for the auditor, whichever is later, but, in no event, shall it take longer than 6 weeks), the auditor shall verify the destruction. Defendants shall also bear the cost of the verification of the destruction.

   ii. If the parties cannot agree that the material or obstruction evidences non-compliance with the Court's Permanent Injunction and Order (subject to the provisions of this order, including iii (below)), the issue shall be presented to the Court for determination and, if the Court determines the Defendants' have not complied with the Permanent Injunction and Order,

the Defendants shall bear the cost of the auditor's inspection and the other party's attorney's fees and costs in returning to the Court.

iii. Unless ATG's position is wholly unreasonable or would cause Defendants' substantial harm, which Defendants must clearly prove, the parties agree that ATG's determination of whether material is covered by this Permanent Injunction and Order shall govern whether the auditor identified material is covered by this Permanent Injunction and Order. In such rare circumstances that the parties disagree over whether ATG is being wholly unreasonable that identified material falls under this Permanent Injunction and Order, the parties may return to the Court as described above.

iv. Nothing in this Permanent Injunction and Order affects ATG's right or ability to seek further appropriate relief from a Court for violation of this Permanent Injunction and Order.

2. ATG may conduct an audit as described above, at ATG's sole discretion but no more than once a year for the next 15 years.

**SO ORDERED.**

Dated: July 5, 2019.

RRthfd

REBECCA RUTHERFORD
United States Magistrate Judge for the Northern District of Texas

Dated: June 6, 2019 (corrections dated June 28, 2019)

*s/ Robert Manley*
Robert Manley, Lead Attorney
Texas State Bar No. 00787955
rmanley@mckoolsmith.com
Steven D. Wolens
Texas State Bar No. 21847600
swolens@mckoolsmith.com
Eric Hansen
ehansen@mckoolsmith.com
Texas State Bar No. 24062763
Avery Williams
Texas State Bar No. 24075282
awilliams@mckoolsmith.com
Rudolph "Rudy" Fink, IV
Texas State Bar No. 24082997
rfink@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

**ATTORNEYS FOR PLAINTIFF ADVANCED TECHNOLOGY GROUP, INC.**

*s/ R. Heath Cheek*
R. Heath Cheek
Texas Bar No. 24053141
hcheek@bellnunnally.com
Jeffrey A. Tinker
Texas Bar No. 24060733
jtinker@bellnunnally.com
Ross Angus Williams
Texas Bar No. 24066296
rwilliams@bellnunnally.com
Saba F. Syed
Texas Bar No. 24088497
ssyed@bellnunnally.com
Katie R. Beaird
Texas Bar No. 24092099
kbeaird@bellnunnally.com
**BELL NUNNALLY & MARTIN LLP**
2323 Ross Avenue, Suite 1900
Dallas, Texas 75201
Telephone: (214) 740-1400
Telecopier: (214) 740-1499

**ATTORNEYS FOR DEFENDANT SPERLONGA DATA & ANALYTICS SYSTEMS, LLC**

*s/ Joshua L. Hedrick*
Joshua L. Hedrick
Texas State Bar No. 24061123
Laura M. Fontaine
Texas State Bar No. 24065239

**HEDRICK KRING, PLLC**
1700 Pacific Avenue, Suite 4650
Dallas, Texas 75201
(Tel.) (214) 880-9600
(Fax) (214) 481-1844
Josh@HedrickKring.com
Laura@HedrickKring.com

**ATTORNEYS FOR DEFENDANT DIGITFORGE**

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **ADVANCED TECHNOLOGY GROUP, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SPERLONGA DATA & ANALYTICS SYSTEMS, LLC AND DIGITFORGE ENTERPRISES, LLC,**<br><br>**Defendants.** | **Case No. 3:17-cv-3270-BT**<br><br>**JURY TRIAL** |

[Name of person], being sworn, hereby states and affirms as follows.

1. My name is ________________________________. My current residence address is ________________________________________________. I am a citizen of ____________________ and am over the age of eighteen.

2. I am a current / former (circle one) officer / employee / contractor (circle one) of defendant ______________________________.

3. On ____________________, I received a copy of the Agreed Stipulated Permanent Injunction and Final Judgment Order ("Permanent Injunction and Order"), which was signed by the Honorable Rebecca Rutherford, and entered by the Court on __________________. A true and correct copy of the Permanent Injunction and Order I received is appended to this Affidavit.

4. I have complied with the terms of the Court's Permanent Injunction and Order.

5. I will comply with the terms of the Court's Permanent Injunction and Order in the future.

6. I agree to permanently refrain from using or disclosing any copy of a C3 Database (as that term is defined in the Court's Permanent Injunction and Order) or anything derived from or based upon such a copy.

7. I agree to permanently refrain from using or disclosing anything learned from access or use of a C3 Database (as that term is defined in the Court's Permanent Injunction and Order) or anything derived from or based upon such knowledge.

8. I voluntarily submit to the jurisdiction of the Northern District of Texas for the enforcement of this affirmation.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on ______________, at _________________________.

_____________________________________________ [Full name]

State / Province of ________________, City of ___________________________

Subscribed and sworn to before me

This ____ day of ______________, 2019.

________________________________

Notary Public